UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X    Case No.:

Miles Rijper-Greenidge,

                                Plaintiff,        **COMPLAINT**

        -against-

Michael McGuire, Salvatore Provenzano, Carl Rordamel,  **PLAINTIFF DEMANDS**
Nicolaos Tjortjoglou, Ryan Miller, Jillian Flannagan, and John  **A TRIAL BY JURY**
and Jane Does No. 1-9,

                              Defendants.
------------------------------------------------------------------------X

       Plaintiff, Miles Rijper-Greenidge, by his attorneys, COHEN&GREEN PLLC, hereby

complains of the defendants, upon information and belief, as follows:

       1.      This is an action for false arrest and excessive force that arose when police officers

in the New York City Police Department saw two Black men, bloodied and in distress, surrounded

by a group of white men (all entirely unscathed).  In fact, it was those two Black men who called

the police there in the first place.

       2.      As they had told the police, it was Plaintiff, and his brother, who had been assaulted

(it was specifically Plaintiff's brother who had called the police asking for help)

       3.      Somehow, faced with that, the police ended up arresting the bloodied victims.

       4.      That is, rather than receive help, Plaintiff was arrested, and falsely charged with

felony assault and robbery.

       5.      Even after watching video of the assault Mr. Greenidge suffered, demonstrating

conclusively what had happened, the officers affirmatively fabricated robbery charges contradicted

by the video.  And seemingly the officers avoided sending that video to prosecutors, perhaps

because once prosecutors received the video and spoke to Mr. Greenidge, they promptly dismissed

the false charges.

## PARTIES, VENUE AND JURISDICTION

6.      At all times mentioned herein, Plaintiff, Miles Rijper-Greenidge (Mr. Greenidge; he/him), was an adult resident of New York County, in the State of New York.

7.      As alleged below, the underlying incident took place in Manhattan, within New York County, New York.

8.      Defendant Michael McGuire is an NYPD police officer living in New York.

9.      Defendant Salvatorre Provenzano is an NYPD police officer living in New York.

10.     Defendant Carl Rordamel is an NYPD police officer living in New York.

11.     Defendant Ryan Miller is an NYPD police officer living in New York.

12.     Defendant Jillian Flannagan is an NYPD police officer living in New York.

13.     Defendant Tjortjoglou is an NYPD police officer living in New York.

14.     Defendants Doe #1-9, are believed to be NYPD police officers living in New York.

15.     Defendants are sued herein in their official and individual capacities.

16.     Plaintiff is not currently aware of the true names of the Doe Defendants.

17.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

18.     Venue is proper pursuant to 28 U.S.C. § 1391, et seq., in the Southern District of New York, where Plaintiff resides, and where the claims arose.

19.     This case is related to the case styled, *Lucas Rijper Greenidge v. McGuire et al.*, 23-cv-6980 (KPF) (referred to herein as "*Lucas*" since both Mssrs. Rijper Greendige share the same last name), as they arise from the same incident and Plaintiff will be filing a statement of relatedness contemporaneously with this complaint.

## RELEVANT FACTS

20.     Plaintiff incorporates by reference all of the allegations in *Lucas*.

21.     On August 10, 2023, Mr. Greenidge accompanied his brother Lucas (first name used for the same reasons identified above) as a witness during a meeting with a former business associate.

22.     That former associate, Nick Spanos, contractually owed Lucas a substantial amount of money, and the meeting was ostensibly to discuss a plan for Mr. Spanos to repay the funds he had stolen from Lucas over time.

23.     Specifically, Mr. Spanos's debts to Lucas were documented in the form of so-called "smart contracts."

24.     Generally speaking, smart contracts are contracts that automatically execute when certain events are undertaken, without need for an intermediary or escrow.

25.     The relevant contractual details are set out in *Lucas*, *see* ECF No. 9 ¶¶ 16-22.

26.     In short, Plaintiff and Lucas intended to meet with Mr. Spanos at the Bitcoin Center in Manhattan.

27.     Mr. Spanos had represented that he wanted to discuss a "payment plan" to repay money he owed to Lucas.

28.     Thus, Lucas went to collect from Mr. Spanos, and Plaintiff went with him as a witness.

29.     At some point in or around 2015, Mr. Spanos had stolen Lucas's phone and begun doing what is referred to as "SIM swapping" to impersonate him and steal from him.

30.     SIM swapping involves essentially using SIM card trickery to impersonate someone.  It is often used to fraudulently get around two-factor authentication and the like.  It is

an especially common scam in the Bitcoin space in part because once Bitcoin is transferred it is near impossible to get back.

31.    Upon information and belief, Mr. Spanos had been engaging in SIM swapping in the lead up to this meeting.

32.    Upon arriving at the Bitcoin Center, Mr. Greenidge and Lucas were physically assaulted by a group of men who worked for or with Mr. Spanos.

33.    Mr. Greenidge was kicked, and punched, his clothing was torn and removed.  He was tackled from behind onto the concrete floor, choked for almost a minute by putting a significant part of their weight on their knee or elbow into the back of his neck.  He was doused with a bucket of paint.  And Mr. Greenidge's passport was stolen.

34.    In short, Mr. Greenidge's physical injuries were visibly obvious — to anyone who came upon the scene, there was no question who was a victim.

35.    Lucas called the police.

36.    This is, of course, what any citizen ***should*** be able to do when they are assaulted.

37.    Defendants arrived shortly thereafter.

38.    At the time, the individual Defendants could see that Mr. Greenidge and Lucas looked as though they had been beaten severely, with ripped clothing and covered in paint.

39.    Upon information and belief, Defendants in fact observed the facts in Paragraph 38.

40.    At the time, the individual Defendants could also see the situation involved two groups:  two Black men (Mr. Greenidge and his brother), and surrounding them, a larger group of white men (Mr. Spanos and his associates).

41.    Upon information and belief, Defendants in fact observed the facts in Paragraph

40.

42.     Despite all of this, Defendants apparently decided to escalate and use extreme force on Plaintiff and his brother.

43.     Defendants pointed at least two tasers at Mr. Greenidge and his brother.

44.     Defendant Carl Rordamel pointed a ***handgun*** at Mr. Greenidge and his brother.

45.     Mr. Greenidge immediately raised his hands and went to the ground, and his brother had his hands in the air.

46.     Upon information and belief, at no point did any Defendant subjectively believe they were in any danger of physical harm.

47.     Neither Plaintiff nor Lucas engaged in any conduct that would give any Defendant probable cause for ***any*** arrest, let alone an escalation to near deadly force.

48.     Nonetheless, and without justification, one of the John Doe Officers, who may be upon information and belief, Defendant McGuire, deployed his taser on Lucas.

49.     In fact, that John Doe had his Taser drawn before he walked into the building.

50.     Because of the paint, there was a channel for a Taser charge to spread.

51.     Upon information and belief, the Doe Officer had been trained not to fire a taser in that circumstance.

52.     That John Doe continued to shock Lucas for over ten seconds.

53.     Eventually the Taser in fact began to shock that John Doe Officer.

54.     It was only upon being shocked himself that he stopped.

55.     As set out in *Lucas*, these events appear on video, and the version of the events depicted by the video is hereby incorporated by reference herein.

56.     Officer Doe's use of the Taser was completely and utterly unjustified by the

5

circumstances, and the continued tasing after the initial strike was malicious and wanton.

57.    The firing of a conducted electrical weapon in the direction of, and continuing to fire said weapon in the vicinity of, Mr. Greenidge while he was covered in flammable liquid, there was flammable liquid present, was malicious and wanton.

58.    The deployment of, and continuing to deploy conducted electrical weapons in the vicinity of Mr. Greenidge while he was covered in flammable liquid, there was flammable liquid present, was malicious and wanton.

59.    Additionally, Defendants destroyed certain of Lucas's papers which included the smart contracts on which he had the right to execute, and which he had come to execute that day.

60.    The officers then stayed and chatted casually with the group of white men who had assaulted Plaintiff and his brother.

61.    Of course, officers can only rely on the facts in front of them in making an arrest. But they had been *called* by Mr. Greenidge's brother.  They responded to ***the Greenidges'*** call for protection and help.

62.    Eventually, Defendants even reviewed security video that showed Mr. Spanos and his associates assaulting Plaintiff and Lucas.

63.    Upon information and belief, upon reviewing that video, Defendants ***subjectively knew*** there was no probable cause to arrest Plaintiff or his brother.

64.    Likewise, upon information and belief, upon reviewing that video, Defendants ***subjectively knew*** there was in fact probable cause to arrest Mr. Spanos and his associates.

65.    Yet, after reviewing video, the officers never arrested the men who assaulted Mr. Greenidge and his brother.

66.    In fact, the video not only showed the men assaulting Mr. Greenidge, but also

showed Mr. Spanos disposing of a phone when the police arrived on the scene — another act giving rise to probable cause.

67.     In short, any reasonable investigation would have revealed that it was Mr. Spanos and his associates who should have been arrested and prosecuted.

68.     But Mr. Greenidge and his brother were arrested instead.

69.     Lucas required medical attention following the assaults and tasing.

70.     When paramedics arrived, however, Defendants directed the paramedics to "treat" Mr. Spanos and his associates first, despite the fact that they had suffered no injuries whatsoever.

71.     Rather than allow Lucas to receive medical attention, the police interrogated him at the scene.

72.     It was only after they concluded questioning him that the police took Lucas to a nearby hospital.

73.     Mr. Greenidge was taken to the police precinct and held for hours by the Defendant officers.

74.      At the police precinct Mr. Greenidge asked for water.

75.     One of the Defendant officers gave Mr. Greenidge a plastic bottle that he (the officer) told Mr. Greenidge had been taken out of the garbage and filled with water.

76.     That officer refused to give Mr. Greenidge any sanitary access to water.

77.     There was no water in the cells.

78.     Given no alternative, Mr. Greenidge drank the liquid in the bottle given to him by the officer.

79.     Predictably, he became sick.

80.     Mr. Greenidge began to vomit profusely on the floor of the cell to which he was

7

confined.

81.     Hours later the Plaintiff was told by Officer Provenzano that the officers had reviewed the video and decided to place Mr. Greenidge and his brother under arrest.

82.     Plaintiff and his brother were then taken downtown to central booking together.

83.     Upon arrival at central booking Mr. Greenidge was led to a room with nurses, who asked medical questions and checked his temperature.

84.     Mr. Greenidge was informed by a nurse that he had a high temperature and would be sent to the hospital for a covid test.

85.     During his entire stay in the hospital Mr. Greenidge was forced by the defendant officers to stand on his feet, with no support, in arm and leg shackles, for over 9 hours, resulting in heavy bruising and cuts on his arms and legs that took weeks to heal.

86.     At the hospital, Defendants Miller and Flanagan denied Plaintiff access to any food and drink.

87.     During this time, he was subjected to degrading comments and taunting remarks from the defendants.

88.     At one point Defendant Flanagan left, and Defendant Miller denied the plaintiff access to medical attention when he repeatedly asked for a doctor.

89.     In the morning, Mr. Greenidge was taken to central bookings, where he was held for some time before being arraigned on assault and robbery charges.

90.     Defendants were, at that time, in possession of the security video, and reviewed it.

91.     Instead of accurately describing that video, they instead fabricated evidence and forwarded that evidence to prosecutors.

92.     Defendants stated untrue facts regarding the incident in the criminal complaint they

swore out, including, but not limited to the facts below.

93.     Defendants stated that Mr. Greenidge attempted to flee the scene.

94.     Not so.

95.     As depicted in the video, at no point did Mr. Greenidge or Lucas attempt to flee.

96.     Defendants knowingly falsified this fact in what they forwarded to prosecutors.

97.     Defendants stated that Mr. Greenidge punched Mr. Spanos in the face.

98.     Again, not so.

99.     As depicted in the video, at no point did Mr. Greenidge or Lucas punch Mr. Spanos in the face.  Nor did any Defendant have a basis to make this claim from within their personal knowledge or otherwise.

100.    Defendants knowingly falsified this fact in what they forwarded to prosecutors.

101.    He had not.

102.    The officers stated that Mr. Greenidge had stolen or participated in the theft of a cell phone.

103.    Again, not so.

104.    In fact, the Patrol Guide provides that when a theft of a cell phone is alleged and an arrest is made, typically, officers should follow certain procedures including identifying the owner of the phone in the obvious ways.

105.    No Defendant complied with any of those procedures.

106.    No Defendant had any basis to make this statement.

107.    Defendants knowingly falsified this fact in what they forwarded to prosecutors.

108.    Defendants subjectively knew that whatever probable cause they had had dissipated once they viewed the videos.

9

109.    Yet, they intentionally misled prosecutors, and made false allegations they knew would result in an extended prosecution and possible conviction.

110.    Mr. Greenidge was forced to pay for a criminal defense attorney to defend the falsified charges.

111.    He was placed on supervised release for the duration of the prosecution and subjected to significant deprivation of his liberty.

112.    His business partner left his business because he did not want to be in business with an accused criminal.

113.    He has also suffered significant distress and other harm.

114.    The charges were dismissed and sealed essentially as soon as prosecutors reviewed the videos and could see the story they'd heard from Defendants was a fabrication.

**FIRST CAUSE OF ACTION**
**(Section 1983 False Arrest Claim Against All Defendants)**

115.    Plaintiff hereby realleges and incorporates all of the preceding paragraphs as though they were fully set forth herein.

116.    The individual defendants willfully and intentionally seized, searched, detained, and arrested plaintiff, and caused him to be imprisoned, without probable cause, and without a reasonable basis to believe such cause existed.

117.    Plaintiff had not been engaged in any criminal conduct, nor was he engaged in any conduct that could reasonably be viewed as criminal nor a basis to justify his arrest.

118.    Despite the absence of sufficient legal cause, plaintiff was arrested and jailed.

119.    By so doing, the individual defendants subjected plaintiff to false arrest and imprisonment, and thereby violated and aided and abetted in the violation of plaintiff's rights under the Fourth Amendment of the United States Constitution.

120.     By reason thereof, the individual defendants have violated 42 U.S.C §1983 and caused plaintiff to suffer the deprivation of her liberty, loss of her constitutional rights, physical injuries, and mental anguish.

## SECOND CAUSE OF ACTION
**(Section 1983 Denial of a Fair Trial Claim Against the Individual Defendants)**

121.     Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

122.     The individual defendants willfully and intentionally fabricated evidence by falsely memorializing claims to have witnessed plaintiff engaging in criminal or unlawful activity, and then forwarded these materially false claims to a prosecutor in order to justify the arrest of plaintiff, and to justify, bring about and cause plaintiff to be deprived of his liberty and to be criminally prosecuted.

123.     By so doing, the individual defendants subjected the plaintiff to denial of a fair trial and violation of his right to due process by fabricating evidence and otherwise providing prosecutors with a materially false and misleading version of events, and thereby violated plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

124.     By reason thereof, the individual defendants have violated 42 U.S.C. §1983 and caused plaintiff to suffer the deprivation of his liberty, loss of her constitutional rights, physical injuries, and mental anguish.

## THIRD CAUSE OF ACTION
**(Section 1983 Excessive Force Claim Against All Defendants)**

125.     Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

126.     As a result of the foregoing, defendants subjected plaintiff to excessive force with no legal basis, justification or excuse.

127.     As a result of the defendants' conduct, the plaintiff was subjected to a level of force by the defendants in excess of what was reasonable under the circumstances.

128.     As a result of the foregoing, plaintiff's liberty was restricted and he was put in fear for his physical safety without probable cause or any legal justification, and he was physically injured.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiff demands judgment against Defendants as follows:

i.      actual and punitive damages against defendants in an amount to be determined at trial;

ii.     attorney's fees pursuant to, inter alia, 42 U.S.C. §1988 and New York common law;

iii.    disbursements, and costs of the action; and

iv.     such other relief as the Court deems just and proper.

Dated:  New York, New York
        November 3, 2023

                                        J. Remy Green

                                            /s/

                        By:     _____
                                COHEN&GREEN PLLC
                                1639 Centre Street, Suite 216
                                Ridgewood, NY 11385
                                Tel.: 929-888-9480
                                elena@femmelaw.com